

DAVID E. RICE
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| JOSHUA MATTHEWS, | * | Case No. 17-17605-DER |
| Debtor. | * | (Chapter 7) |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| SCOTT CROCKER, et ux., | * | |
| Plaintiffs, | * | |
| vs. | * | Adversary Pro. No. 17-00447-DER |
| JOSHUA MATTHEWS, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### <u>MEMORANDUM OPINION</u>

Joshua Matthews ("Matthews") was the founder of Bulk Head Brewing Company, LLC ("BHB"), a failed start-up craft brewing business. Scott and Leah Crocker invested $52,000 in equity interests in BHB in August and September of 2016. Scott Crocker ("Crocker") later guaranteed a $100,000 loan by Howard Bank to BHB in January of 2017. Ultimately, BHB

never opened for business and Crocker paid $98,560.13 in November of 2017 to satisfy BHB's loan liability to Howard Bank. The Crockers thus lost $150,560.13 on their investments in BHB.

In June of 2017, Matthews filed a voluntary Chapter 7 bankruptcy petition in this court. Thereafter, the Crockers filed this adversary proceeding, in which they seek a determination that their claims against Matthews are excepted from discharge (that is, nondischargeable) under 11 U.S.C. § 523(a)(2). A trial on the merits was conducted on December 4, 6, and 7, 2018. At trial, Matthews, Crocker, and several other witnesses testified, and the parties offered numerous exhibits that were introduced into evidence. Leah Crocker did not testify at trial in support of her claims. The Crockers asserted at trial and in closing argument that their claims are nondischargeable because Matthews made false statements about (i) BHB's liability to its landlord, (ii) BHB's liability to its general contractor for the buildout of the premises it intended to use for operation of a microbrewery, and (iii) BHB's licenses.

Following trial, the court held this matter under advisement. For the reasons explained below, the court has determined that 11 U.S.C. § 523(a)(2) does not apply and that thus the claims of the Crockers are subject to discharge.[1]

## JURISDICTION

The court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Rule 402 of the Local Rules of the United States District Court for the District of Maryland. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I). This memorandum opinion constitutes the court's findings of fact and conclusions of law in

---

[1] In his main bankruptcy case, Matthews was granted a Chapter 7 discharge on November 15, 2017. See *In re Joshua Matthews*, Case No. 17-17605-DER [Docket No. 21]. No creditors other than the Crockers filed a complaint for determination of nondischargeability pursuant to 11 U.S.C. § 523(b). On August 2, 2017, the Chapter 7 trustee filed a Report of No Distribution, in which the trustee requests that he be discharged from office because he made diligent inquiry and determined that there is no nonexempt property to be administered for the benefit of creditors [Main Case Docket No. 20]. In other words, this is a routine no asset Chapter 7 case but for the claims made by the Crockers.

accordance with Rule 52 of the Federal Rules of Civil Procedure (made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure).[2]

## FINDINGS OF FACT

The following findings of fact are either undisputed or are supported by a preponderance of the evidence presented. In making these findings, the court has considered the demeanor and credibility of the witnesses and has reviewed the more than 70 documents introduced into evidence by stipulation of the parties, many of which documents were neither discussed in the testimony of the witnesses nor mentioned by counsel in closing argument.

### *Background*

Matthews developed skill as a brewer of craft beer at a young age. By the age of 23 he had founded BHB and undertaken to open a business brewing craft beer for both wholesale and retail sale. Unfortunately, his brewing skills and youthful enthusiasm were not enough—as the events described below amply demonstrate—to overcome his lack of business acumen. BHB proved to be a financial disaster. As a result, Matthews filed a Chapter 7 bankruptcy petition in this court and the Crockers now assert their claims for recovery of their $150,560.13 lost investment in BHB are not dischargeable.

Matthews was born on September 20, 1991. After graduating from high school in 2009, he attended first Virginia Wesleyan University, then Howard Community College, and finally Towson University. He was an environmental science major at Towson University, but left school in May of 2014 before obtaining a degree in order to devote fulltime effort to starting a craft brewing business of his own. Prior to starting BHB, Matthews' work experience was limited to various short-term low-level jobs as a busboy, cook, waiter, cashier, and sales

---

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

associate.  Prior to founding BHB, Matthews had never owned or operated a business and had never negotiated a commercial lease.

At the age of 21, Matthews started brewing beer at home for personal consumption.  By 2013, he was operating a nanobrewery on the porch of his parents' house.  His nanobrewery was capable of brewing one barrel of beer (31 gallons) at a time.  Because he was brewing at home for personal consumption, no license was required.  Eventually, he joined Frederick's Original Ale Makers (known as "FOAM"), a Frederick, Maryland based club of homebrewed beer enthusiasts, and the Brewers Association of Maryland ("BAM"), a craft beer trade organization. Matthews shared his home brewed beers with members of FOAM, and his beers were well received by members, which included professional beer judges.

### *BHB's Organization and Early Efforts: Oct. 2014-Aug. 2016*

BHB was a Maryland limited liability company organized by Matthews on October 27, 2014 by the filing of Articles of Organization with the Maryland Department of Assessments and Taxation.[3]  At all times relevant to this dispute, Matthews was the owner of not less than a 42% equity membership interest in BHB and as the designated Chairman of the Board was its chief executive officer and the person in control of BHB.

Once Matthews made the decision in the spring of 2014 to start his brewery business, he decided to apply for the federal license needed as a prerequisite for the state and local licenses necessary to manufacture and sell beer.  The Alcohol and Tobacco Tax and Trade Bureau (the

---

[3] Plaintiffs' Exhibit 10.  As stated in the Articles of Organization, the purpose of BHB was: "Microbrewery ran our [*sic*.] of my home.  We make hand crafted ales and lagers for distribution to local restaurants and liqour [*sic*.] stores."  This language and its grammatical and typographical errors are indicative of the amateurish (but no doubt well-intended) nature of Matthews' enterprise and they foreshadow the many problems that would eventually befall BHB due to his lack of experience and business acumen.

"TTB") of the Department of the Treasury ultimately issued an approved Brewer's Notice to BHB on February 8, 2016 (the "TTB Brewer's Notice").[4]

In the summer of 2014, Matthews began talking with Jonathan Staples, an established business owner based in Frederick, Maryland. Jonathan, along with his wife Hilda, owns various local well-known restaurants as well as a distillery in Richmond, Virginia. Matthews initially began searching on Zillow and other internet websites for real estate that might be suitable for a brewery. Later, working with an agent, he visited various potential locations. After such site visits, Matthews would seek Jonathan's feedback. By reason of this assistance, Matthews viewed Jonathan as a mentor. Eventually, Jonathan agreed to become a part owner of BHB and they agreed that Hilda would do the bookkeeping for the company.

While searching for a location, Matthews began seeking funding using online crowdfunding for the purpose of expanding BHB beyond a home-based nanobrewery. He created one crowdfunding campaign on the Kickstarter website. The Kickstarter campaign ran from January 29 through March 16, 2015 and did not meet its goal of $5,000 in funding; rather it only garnered $630 in pledges.[5] Matthews created a second—and equally unsuccessful— crowdfunding campaign on the GoGetFunding website. Although it is not clear when the

---

[4] Defendant's Exhibit 31. The TTB Brewer's Notice authorized BHB to conduct brewery operations for four years from the February 8, 2016 effective date. No evidence was introduced at trial to indicate that BHB failed to comply with the TTB Brewer's Notice after it was issued.

[5] Plaintiffs' Exhibit 8. The title of the Kickstarter campaign was: "Bulk Head Brewing Co. by Josh Matthews." Apparently, it contained a video that was not introduced into evidence titled "Crafting a Nation" featuring a Brian Hunt describing the craft beer movement in general. The lengthy text from this website makes clear that it was describing BHB in its earliest stage; stating at one point that "Josh has only been brewing for a year" and at another that it was asking backers to "support us in our expansion project of our current nano brewery into a microbrewery." With respect to BHB's licenses, the website stated, "We have gotten licensed by the state and federal level which allows us to sell wholesale but because of our small, one barrel nano system we can only brew so much (31 gallons) at a time." Whatever the accuracy of that statement, it was made about the licensing for BHB's nanobrewery home-based operation and not about BHB's microbrewery operation at the premises leased months later. This exhibit contains no statements about BHB's liabilities.

GoGetFunding campaign ran, it failed to meet its stated goal of $21,000 and only garnered $1,300 in pledges.[6]

In June of 2015, BHB entered into a lease for a business premises at 8989 Route 108, Columbia, Maryland 21045 (the "Lease").[7]  The Lease provided for a commencement date of July 1, 2015, and for a $72,000 allowance for tenant improvements to be paid by the landlord to BHB's general contractor.  The Lease also provided that BHB's liability for the monthly base rent of $5,700 was abated for the first four months.  BHB's security deposit of $11,400 and $7,638 down payment on common area maintenance and real estate taxes due from BHB under the Lease was paid by Jonathon Staples.  While the negotiation of the Lease was ongoing, Jonathan purchased the equipment for BHB's 3-barrel microbrewery system that eventually was installed at the leased premises.[8]

BHB hired Domco Mechanical, Inc. ("Domco") as its general contractor for construction of the tenant improvements.  Dominic E. Totaro ("Totaro"), the owner of Domco, was a long-time friend of the Matthews family.[9]  After some negotiation between Matthews and Totaro,

---

[6]  Plaintiffs' Exhibit 9.  The title of the GoGetFunding campaign was: "Bulk Head Brewing Company Fundraiser by Josh Matthews."  Only a three-page portion of the campaign website (one of which is blank) was introduced into evidence.  Apparently, the campaign website contained a video (similarly not introduced into evidence) entitled "BHB Walk Through" and text that read in part: "Who We Are: Local Microbrewery opening in Columbia, Maryland.  We make great beer and have proven that time and time again by holding tastings to friends, family and even strangers who simply have a passion for craft beer!  We are all about locality so being able to bring something 'home-made' …."  Whatever else was said in that text was not introduced into evidence.  This exhibit contains no statements about BHB's licenses or its liabilities.

[7]  Plaintiffs' Exhibit 22.

[8]  At trial Crocker stated that that as an investor he was reassured by Matthews' relationship with Jonathan Staples and that he was later dismayed to learn that Matthews and Staples had a falling out.  Matthews testified that at a certain point he had a falling out with Hilda Staples because she was rude to him and he thus did not want her involved in BHB.  Jonathan and Hilda Staples then stopped talking to Matthews from the winter of 2015 until the summer of 2016, at which point Matthews and Jonathan reconciled.  Jonathan retained an ownership interest in BHB at all times relevant to the dispute.  The extent of Jonathan's active participation in BHB's business after the reconciliation, however, is unclear from the evidence presented to the court.  In any event, it was after the reconciliation with Jonathan that Crocker met Matthews.

[9]  Totaro was called to testify at trial by the Crockers.  Despite his long-time friendship with Matthews' family, Totaro's testimony was entirely credible.  In addition, he was the only non-party witness called to testify who had actual personal knowledge of events relevant to this dispute.  The only other witness was the corporate

Domco agreed on a price for construction of the tenant improvements of $232,905 pursuant to an invoice dated September 21, 2015.[10] Totaro had a realistic assessment of Matthews' ability to finance and manage the project of opening BHB's microbrewery—namely, he believed Matthews lacked the necessary experience and knowledge about how to run a business. Totaro was particularly concerned about financing and how Domco's invoices would be paid by BHB. As a result, he managed Domco's risk by stopping work on the project whenever Domco had overdue unpaid invoices in the range of $50,000 to $60,000. His suspicions of Matthews' lack of business sense were confirmed by, among other things, Matthews confusion on multiple occasions of the balance due versus the total due under the contract when he received statements from Domco.

Domco began work in October of 2015. Totaro believed that the work could be completed within four to five months but did not complete the buildout until almost a year and a half later. Totaro stated the delay was the result of payment problems due to BHB's lack of sufficient financing. The landlord paid Domco approximately $60,000 pursuant to the Lease by draws in November and December of 2015, and February of 2016. BHB paid Domco $30,330 in April of 2016.[11] Domco did not receive another payment until August of 2016, when BHB paid an additional $50,000.[12]

---

representative of Howard Bank, Thomas E. Fongemie, who was credible but (as further explained below) only became an employee of the bank well after all the relevant events occurred.

[10] Plaintiffs' Exhibit 32. This invoice was signed by Matthews and Totaro, and was the contract document. The original estimate dated September 11, 2015 was for a total price of $278,443. Matthews then revised the scope of the work to be done by Domco, which resulted in the lower buildout price of $232,905. Defendant's Exhibit 36.

[11] On April 26, 2016, a $39,330 check was honored and posted against BHB's checking account at Capital One. Defendant's Exhibit 39 (page 178). It seems likely this was the payment to which Totaro referred in his testimony. The reason for the apparent $9,000 discrepancy is not addressed by anything in the record. For reasons unknown to the court, copies of none of the cancelled checks drawn on this account were introduced into evidence.

[12] On August 10, 2016 (two days before the initial investment by the Crockers), a $50,000 check was honored and posted against BHB's checking account at Capital One. Defendant's Exhibit 39 (page 173). Totaro testified that this payment was made earlier but initially had been returned for insufficient funds on August 3, 2016. There was an entry posted to BHB's checking account on August 4, 2016 that was identified as "TRANSACTION RETURNED 50,000.00 RET TRAN NSF." *Id.* The account balance at the time was indicated as $100,393.92. No

To help with the costs of the buildout and other expenses associated with BHB, Matthews sought a loan from the Howard County Economic Development Authority ("HCEDA") in April or early May of 2016. Based upon guidance provided by HCEDA, BHB applied for a $150,000 loan from The Catalyst Fund, which makes loans to startup businesses in Howard County, Maryland. Because Matthews had little credit history and no assets to support his guarantee of the loan, HCEDA required a cosigner. Eventually BHB proposed that the loan be cosigned by Matthews' mother, Lisa B. Matthews, and that her guaranty would be secured by a beach house in Virginia Beach owned by Lisa Matthews and Matthews' father, Bruce Matthews.

HCEDA apparently not only granted preliminary approval for the loan to BHB, but also made an initial advance of approximately $52,000 pending final approval. Unfortunately, the loan never received final approval. Within a few weeks of receiving the initial advance, Matthews learned that HCEDA would not loan BHB the additional $98,000. HCEDA refused to advance the remainder of the loan because the real estate collateral pledged was ineligible on the grounds that Bruce Matthews was a debtor in a pending Chapter 11 bankruptcy case.[13] HCEDA did not, however, revoke or demand immediate repayment of the $52,000 advance.

In any event, Matthews was concerned by the July 4, 2016 holiday that BHB might never be able to open for business. At around that time he spoke with Bob Rhoades, who he knew as a craft beer enthusiast and maker of mash paddles. Eventually, Bod Rhoades and his wife, Helen

---

evidence was introduced to explain whether the check was dishonored in error or because (perhaps) the substantial deposits of $100,000 on August 1, 2016 were not yet considered cleared and available funds by the bank. In any event, there appears reason for Matthews to have believed that the $50,000 check would be honored, as indeed it eventually was a few days later.

[13] Matthews' explanation for the change of heart by HCEDA is credible. Bruce Matthews filed a voluntary Chapter 11 case in this court on December 1, 2015 that was ultimately dismissed on his motion on June 22, 2017. See *In re Bruce Matthews*, Case No. 15-26736-RAG. According to his schedules, Bruce Matthews was then an owner as a tenant by the entireties with his wife of real property known as 2816 Wood Duck Drive, Virginia Beach, Virginia 23456. This undoubtedly was the beach house that was proposed to be pledged to HCEDA as collateral for the guarantee of the HCEDA loan to BHB.

Rhoades, agreed to make a $90,000 investment in BHB. At or about the same time, Dave Whitmore (a friend of Bob and Helen Rhoades) also agreed to make a $10,000 investment.

At the end of July of 2016, Matthews held a signing meeting attended by Bob and Helen Rhoades, Dave Whitmore, Jeb Carney (as a representative of Jonathan Staples), and Katherine Taylor (the attorney then representing BHB in its effort to obtain a Howard County liquor license). Matthews asked Katherine Taylor to attend and answer questions about the liquor license problems. At that meeting, the new investors delivered checks for their respective $90,000 and $10,000 investments, and the parties signed a BHB operating agreement recognizing membership interests of the new members.[14]

While these events were taking place, Matthews was negotiating an amendment of the year-old Lease with BHB's landlord. The landlord's rent concessions expired on October 31, 2015. As of November 1, 2015, BHB's monthly obligations under the Lease for rent, common area maintenance and real estate taxes totaled $7,638. BHB was apparently unable to pay that amount. By February of 2016, Matthews was receiving demands from the landlord's property manager, Dawn Conley, for payment of the arrearages of approximately $21,000 due as of January 31, 2016.[15] He tried to assure her that funding would soon be available from lending sources. On May 4, 2016, Dawn Conley emailed Matthews again demanding payment of arrearages that were then approximately $54,000.[16]

---

[14] On August 1, 2016, checks in the amount of $90,000 and $10,000 were deposited into BHB's checking account at Capital One. Defendant's Exhibit 39 (page 174).

[15] Plaintiffs' Exhibit 23. In her February 9, 2016 email message, Dawn Conley told Matthews: "Looking over your account, it doesn't appear that anything has been paid since rent started in November. I really need to have a payment made on the account. I know you are not operational yet, but [the landlord] will be really unhappy to hear that nothing has been paid."

[16] Plaintiffs' Exhibit 24. In that message, Dawn Conley states: "The account balance now stands at $54K. The Landlord is very anxious to get a payment towards the balance. It looks like I will have to put the lease in default status if we don't get a payment in this week."

Despite these demands, Matthews was ultimately able to negotiate an amendment to the Lease that provided for a cure of the $70,567.42 in arrearages that existed as of July 31, 2016 by payment of $31,000 and the remainder on a monthly basis over an extended term of the Lease.  It is not clear when the negotiations began; but they were certainly ongoing as of July 11, 2016.[17] Dawn Conley emailed Matthews the landlord's proposed amendment to the Lease on August 5, 2016.[18]  The amendment was signed by the landlord on August 23, 2016, but it was effective as of August 1, 2016.[19]  Matthews paid the landlord $21,000 in advance of execution of the amendment[20] and expected to pay the remaining $10,000 by means of funds to be provided by his uncle.  For reasons not explained by the record, BHB never paid the landlord the additional $10,000 required under the amendment.

### *The First Equity Investment by the Crockers: Aug. 2016*

At this critical moment, Scott Crocker arrived unexpectedly on the scene.  Crocker was then an intelligence analyst working for the National Security Agency ("NSA").  His wife, Leah Crocker, was also employed by NSA.  He ended his 15-year government career a few months later in November of 2016 to become a stay at home dad for their twin daughters.  The Crockers are far from unsophisticated individuals.  At the time of trial, Leah Crocker was employed by NSA as a manager supervising 120 employees.  Crocker described himself to Matthews as good

---

[17] Defendant's Exhibit 1.  In his July 11, 2016 email message, Matthews told Dawn Conley that "[m]y uncle is still okay with giving me the 10k he just wants to see that revision of the lease we talked about."

[18] Defendant's Exhibit 7.  The economic terms of the proposed amendment appear to be the same as the ones specified in the amendment ultimately executed by the parties.

[19] Plaintiffs' Exhibit 29.

[20] On August 11, 2019 (the day before the initial investment by the Crockers), a $21,000 check was honored and posted against BHB's checking account at Capital One.  Defendant's Exhibit 39 (page 172).  Matthews returned the signed amendment to Dawn Conley by email on August 17, 2016.  Defendant's Exhibit 9.  Based upon all the evidence, the court concludes that the check that cleared on August 11, 2019 was the payment to the landlord in connection with amendment of the Lease.

with money, investments, spreadsheets, and loans, and as someone who had thus been able to retire in his mid-30's with a net worth of $2 million.[21]

The Crockers also had experience in the industry of startup craft breweries. At some point, Leah Crocker worked for the State Department and was posted at the U.S. Embassy in Beijing, China and Scott Crocker was employed as a computer technician by the State Department. While in China, the Crockers met an American who was establishing a startup brewing business there known as Great Leap Brewing. In 2012, the Crockers made an investment in Great Leap Brewing (which was an operating business at the time) that Scott Crocker characterized as successful but one that had yet to yield any profits.[22]

Matthews and BHB came to the attention of Crocker during the Summer of 2016 through internet articles that appeared in the Washington City Paper and the Baltimore Business Journal including a City Paper article by Tim Ebner dated August 6, 2015.[23] At or about the same time, Crocker also reviewed the crowdfunding campaigns that appeared on the Kickstarter and GoGetFunding websites requesting funding for BHB. While Crocker may have later mentioned the City Paper article and the crowdfunding websites, nothing in the record suggests that Matthews ever directed Crocker to them, suggested that Crocker could rely on them for information about BHB, or used them in any way to obtain money from the Crockers.

---

[21] Defendant's Exhibit 18. It seems likely that the $2 million net worth figure included the net worth of Leah Crocker. In November of 2016, Crocker provided Matthews with personal financial information in connection with an application for a possible BHB loan from Sandy Spring Bank that set forth his estimated net worth (not including Leah's assets) as $1,424,000. Defendant's Exhibit 14. Thus, Leah Crocker's net worth was at the time likely more than $500,000.

[22] The amount of the Great Leap Brewing investment is not entirely clear from the record, but it was apparently substantial—Matthews testified that Crocker told him he had invested $100,000 or maybe as much as $200,000 in Great Leap Brewing.

[23] Plaintiffs' Exhibit 7. The article states that "when [Matthews] opens Bulk Head Brewing Company in Columbia, Md. this fall, he'll be one of the youngest owners of a brewery in the United States." The article describes Matthews as standing in what was the then empty space recently rented by BHB, and then states, "Most of the construction will take place this month [referring to August of 2015], and he hopes to be making his first beer soon after." Thus, if these predictions had been correct, BHB would have been open and operating at the leased premises for eight months or more by the time Crocker read the City Paper article.

On August 1, 2016, Crocker sent Matthews an email message apologizing for "the cold call," introducing himself, and expressing interest in possibly providing financial assistance to BHB.[24]  Matthews sent a reply by email two days later in which he said, "Yeah we are doing what we can to get open ….  I was able to bring on two more investors this past week who between the two invested 100k total.  Sadly we are still about 35,000 short of opening.  So your timing is impeccable!"[25]  After exchanging further email and text messages, they agreed to meet.

Crocker and Matthews met for the first time at the brewery on August 9, 2016.  The meeting lasted for about two hours.  Crocker testified that Matthews told him the brewery would be opening in about two weeks, which seem possible to Crocker based on his observation of the state of the buildout.  They discussed the financial and operational state of the brewery, Matthews' vision for the future of the business, and financial projections for BHB's business.  Crocker testified that they discussed all three subjects about which the Crockers claim Matthews made misrepresentations—BHB's liabilities to the landlord and Domco, and BHB's licenses.

Crocker testified that Matthews told him at their first meeting that he had an arrangement with the landlord under which BHB would not have to pay rent until the brewery was open to the public.  Matthews testified that he then believed that by reason of the amendment to the Lease the next rent payment by BHB was due on September 1, 2016.  At the time, Matthews was confused about whether rent was paid in advance or in arrears, and his focus on September is understandable given the emphasis in Dawn Conley's email messages in July and August not on

---

[24] Plaintiffs' Exhibit 1.  Crocker's message reads in part: "I understand that you're looking for some financial assistance for your brewery.  My wife and I have previously provided capital investment for a friend's craft brewery start-up, and if you're interested we think we could help with your efforts as well.  For example I see that your crowd-source fundraising campaign is about $20K short of your goal so we could talk about getting you what you need to get up and running."

[25] Plaintiffs' Exhibit 1.  In the court's view, the most significant words in Matthews' reply are "short of opening."  They make clear that in Matthews' mind the focus was on what needed to be paid to Domco to get the remaining work completed and the brewery open for business; that is a very different thing from paying Domco in full.  In any event, this statement was not intended to and did not declare the extent of BHB's liability to Domco or any other creditor.

payment of the current rent, but on the $31,000 payment and execution of the amendment—an amendment that extended the term of the Lease and rolled a portion of the rent arrearages into future rent.  After considering the demeanor and credibility of the witnesses, I do not find that Matthews made any statement to Crocker about rent with an intent to deceive.  In any event, Matthews made no representation to Crocker in writing about BHB's liability to the landlord.

Crocker testified that at the first meeting they also discussed how much was owed to Domco in order to finish the buildout and get the brewery open to the public.  According to Crocker, Matthews stated that BHB owed $35,000 to Domco to finish the project.  Matthews testified that he believed based upon information provided by Totaro that $35,000 "would get the job done."  Earlier that month, BHB had paid $50,000 to Domco.  The testimony of both Matthews and Totaro makes clear that Matthews did not always correctly understand the state of BHB's liability to Domco.  On the other hand, the focus of the discussion was on the amount needed to get the brewery open for business.  As an estimate of the amount that needed to be paid to Domco so it would recommence and complete its work pursuant to the contract, Matthews' estimate of $35,000 was materially correct.[26]  After considering the demeanor and credibility of the witnesses, I do not find that Matthews made any statement to Crocker about BHB's liability to Domco with an intent to deceive.

Finally, Crocker and Matthews provided different accounts of their discussion (if any) at the first meeting about BHB's licenses.  Crocker testified that they discussed the status of BHB's licenses.  According to Crocker, he asked Matthews, "Do you have all the licenses you need and he said yes."  On the other hand, Matthews did not recall such a conversation.  When asked whether he discussed the subject with Crocker, Matthews first testified that Crocker had never

---

[26]  As further explained below, the amount then due Domco under the contract was only $38,800.  If that amount had been paid at the time, Domco would have been obligated to complete the tenant improvements, at least to the point of the next milestone (which was final inspection).

asked about the subject and then later testified that he did not remember whether Crocker had ever asked him about the subject."[27]

After considering the demeanor and credibility of the witnesses, I find that the subject of BHB's licenses was not discussed and that Matthews never made the representation about BHB's licenses attributed to him by Crocker.  Some two weeks prior to the time when Crocker states the supposed representation was made, Matthews held a meeting with new investors attended by BHB's counsel, who was present at his request for the very purpose of answering investor questions about the subject of licenses.  The state and county licenses were both contingent on issuance of an occupancy permit by inspection authorities, which necessitated completion of the tenant improvements (the state of which project was readily apparent to everyone during the relevant time period).  Nothing in the evidence suggests that Matthews had

---

[27] Matthews was called to testify as the first witness in the plaintiffs' case in chief.  On direct examination by counsel for the Crockers, Josh testified as follows:

> Q:  Did you explain this to Scott, that you didn't have any of your licenses [referring to the state and county liquor licenses]?
> A:  He didn't ask.
> Q:  Your testimony is that he didn't ask?
> A:  No, he never asked.

Counsel for the Crockers returned to this same line of questioning later in his direct examination, and Matthews was less emphatic and stated that he did not remember the subject being discussed.  During this latter part of the examination, Matthews testified as follows:

> Q:  Did Mr. Crocker ever ask you whether you had your state and county license?
> A:  Not that I recall, no.
> Q:  You don't remember whether he did or he didn't, or …?
> A:  I don't recall him ever asking.  I believe he, we the first time we met he was, uh … we talked about the, what the brewery was about not so much how much the license, not so much the particulars in licensing.
> Q:  Are you testifying that …?
> A:  I am testifying that I don't remember.
> Q:  I am not being combative here, I just want to make sure that we understand the distinction between to the best of your recollection he did not ask, or to the best of your recollection you don't know whether he did or he didn't?
> A:  To be fair, I do not remember if he did, or did not.

any intention or motivation at the time to mislead his latest investor prospect when he had been recently open with others.[28]

On August 10, 2016, Scott Crocker made a second visit to the brewery with Leah Crocker and their twin daughters. Little evidence was introduced as to what transpired at the second meeting. Based upon the record presented, the August 10, 2016 meeting was the only interaction between Leah Crocker and Matthews before the Crockers made their first investment. Leah Crocker did not testify about her meeting with Matthews. Scott Crocker testified that the meeting lasted for an hour or maybe an hour and a half. Without going into any detail, Crocker testified that the meeting "recapped a lot of what was gone over the previous day," and that it was an opportunity for Leah to see the BHB business premises and hear Matthews describe his vision for the business. Matthews did not testify about what he discussed with Leah Crocker other than to say that he did not recall going over the spreadsheet of projections with her. There is no evidence of any representation made by Matthews to either Scott or Leah Crocker at the August 10, 2016 meeting. In any event, the Crockers returned home and after some further discussion and negotiation with Matthews about the amount of the equity interest they would receive, they made their first investment of $36,000 for a 6% interest in BHB.

No written purchase agreement was executed by the parties at the time of the initial investment by the Crockers in BHB. The only documentary evidence of their purchase of an equity interest in BHB is the memo line on the check.[29] Based upon the record, it does not

---

[28] I recognize that there is evidence in the record that at later times Matthews may have been less than honest about the status of BHB's state and local liquor licenses (which were ultimately never obtained). The question before the court, however, concerns misrepresentations (if any) made by Matthews on the subject at or before the time of the investments in BHB by the Crockers. After weighing all the evidence, I find that there were none about licenses because the subject was simply not discussed.

[29] Plaintiffs' Exhibit 4. The check dated August 12, 2016 was drawn on what appears to have been a joint checking account of the Crockers, was payable to "Bulkhead Brewing" in the amount of $36,000 and stated on the memo line that it was for "Bulkhead 6%." The check was deposited in BHB's account at Capital One on August 12, 2016. Defendant's Exhibit 39 (page 172).

appear that the BHB operating agreement was amended to reflect the investment by the Crockers until much later.[30]

Nothing in the record suggests that Matthews ever promised that the $36,000 invested by the Crockers would be paid to Domco or that payment of any amount to Domco—or indeed use of their invested funds by BHB for any particular purpose—was a condition of their investment. The Crockers argued at trial that the disposition of the money they invested is unknown. The court disagrees. BHB's spending may not have been wisely managed by Matthews, but the use of its money is not unaccounted for. The bank account records introduced into evidence show that the funds were consumed in BHB's doomed start-up operations.[31] Moreover, Matthews was not paid a salary by BHB, and nothing in the record indicates that monies invested in or borrowed by BHB were diverted to his personal use.

### The Second Equity Investment by the Crockers: Sept. 2016

After making the first investment, Crocker waited "a couple of weeks" to follow up with Matthews on the status of the buildout. Crocker testified that when he contacted Matthews a few weeks later Matthews told him there had been a "surprise" on the amount he needed to pay to Domco. The record is not entirely clear on how these follow-up discussions took place. There is no evidence, however, that Matthews made any representations during this period about either BHB's liabilities to the landlord or BHB's licenses. The only concrete evidence of those discussions is a series of email messages exchanged by Crocker and Matthews between

---

[30] Plaintiffs' Exhibit 11. This exhibit, which is titled "Limited Liability Company Agreement of Bulk Head Brewing Company, a Limited Liability Company, is undated and unsigned but reflects the ownership interest of the Crockers as 25%. The Crockers did not acquire a 25% interest until Scott Crocker guaranteed the loan made to BHB by Howard Bank in January of 2017. If there was a version of the operating agreement executed at or about the time of the first investment, it was not introduced into evidence.
[31] Defendant's Exhibit 39.

August 31 and September 19, 2016.[32]  This correspondence was cordial.  While he probed Matthews somewhat for the reason why BHB needed more money,[33] Crocker's focus at that time was on capitalizing on an opportunity to (i) increase his equity stake in BHB, and (ii) obtain a seat on the board.  Apparently, no meeting or telephone conversation between Crocker and Matthews occurred while the second investment was negotiated.

According to its payment application for the period through September 19, 2016 (the "Payment Application"), Domco had then completed and billed for work in the amount of

---

[32]  In his testimony about these events, Crocker referred to Plaintiffs' Exhibit 5.  In doing so, Crocker observed that this exhibit is "missing a couple of pages."  The exhibit offered by the Crockers is indeed an incomplete record of the electronic discussion between Crocker and Matthews.  A more complete record of the exchange of messages prior to the second investment is contained in Defendant's Exhibits 10, 11, and 12.  It begins with an August 31, 2016 message from Crocker to Matthews that is part of Defendant's Exhibit 12, continues from there through Defendant's Exhibit 10, and concludes with a September 22, 2016 message that is part of Defendant's Exhibit 11.  This record is further incomplete because the messages refer in several instances to attachments that were not admitted into evidence as part of these exhibits.  In any event, when the messages in Defendant's Exhibits 10, 11, and 12 are read in sequence, they convey—unlike the extract contained in Plaintiffs' Exhibit 5—a clear impression that the discussion was from its beginning about whether Crocker would increase his equity stake and become a board member, not about the specific reason why BHB needed more capital or any proposed specific use for the capital to be invested.  As Matthews said in his September 10, 2016 message to Crocker, "I may have to sell more equity so if thats the case your my first call.  I remember you saying you wanted more skin in it anyway and I would like you and Leah to have more to be honest."  Defendant's Exhibit 10 (page 23) (typographical errors in original).  Crocker's response was not one directed to any particular need for or proposed use of additional funds.  Instead, in his reply on September 11, 2016, Crocker said: "Ok let me know what you need and I'll talk to Leah.  We just dropped a crap-ton of cash on a house for her mom, but we could probably dig up some more *depending on how much extra equity that would buy us*."  *Id*. (emphasis added).  In the end, the question was whether Matthews would give Crocker the board seat he sought in exchange for the $16,000 of cash Crocker then had available to invest.

[33]  It is indeed the case that Crocker and Matthews seemingly discussed specifics about BHB's liability to Domco during their electronic correspondence during this time period.  For example, in his message on September 13, 2016 Matthews said, "Here is a layout of the build out costs and I marked up what has been paid for and what still needs to be paid for, etc.  I am waiting for my GC to get back to me with an exact number but this is close to as accurate as it'll be."  Defendant's Exhibit 10 (page 22).  For reasons unknown to the court, the attached "layout" was not admitted into evidence as part of this exhibit.  In his testimony, Crocker suggested that Plaintiffs' Exhibit 2 is an accounting regarding Domco sent to him by email by Matthews after the first and prior to the second investment, but immediately stated that "I am not entirely sure about that."  As an itemization of work remaining to be performed by Domco, Plaintiffs' Exhibit 2 is materially accurate—the items identified total $38,475 while at or about the same time Domco estimated its remaining work to be $51,093.75 in the Payment Application.  Defendant's Exhibit 37.  A few days later, Matthews sent Crocker a message indicating that after conferring with Domco the "breakdown came back to $37,197.89 left for him [referring to Totaro]."  The difference in these estimates ($13,895.95) is less than 6% of the total contract price of 232,905.  During this time period (and perhaps up to and including trial), Matthews was unclear on his understanding of how construction contract progress payments function and uncertain about the state of BHB's liability to Domco as opposed to the cost to complete unfinished work.  To the extent his statements on this subject during this time period were false or misleading, Matthews made such statements without intent to deceive.  Of equal importance, I do not believe that Crocker in fact relied upon such statements—his focus was negotiating an additional equity position and a seat on the board for the cost of the limited additional funds he then had available to invest.  In other words, as far as Crocker was concerned the pretext for BHB's need for additional capital was irrelevant to him at this point.

$181,811.25 and had been paid $141,200 by BHB.  As a result, Domco was asserting that BHB then owed it $40,611.25 and that once the remaining work was completed, BHB would owe an additional $51,093.75 (for a total of $91,705).[34]  Domco was mistaken.  Under the terms of its contract with BHB, Domco was only entitled to an additional $38,800 as of that date because the last two installments were not due until final inspection ($30,000) and completion ($22,905)— neither of which events had occurred and would not occur for months.[35]  If BHB had paid the $38,800 amount, Domco would have been obligated to complete its work in order to have a right to payment of the remaining $52,905.

Ultimately on September 19, 2019, Crocker offered to invest an additional $16,000 in BHB not because that was an amount tied to BHB's supposed cash needs, but because that was the amount of cash Crocker had available to invest and Matthews agreed to amend the BHB operating agreement so that Crocker would qualify for a seat on the board with a 10% equity stake in BHB.[36]  A few days later, on September 22, 2016, the Crockers invested $16,000 for an additional 4% interest in BHB and a seat on the board.[37]  Like the earlier investment, there was no promise by Matthews that the $16,000 would be used by BHB for any particular purpose; nor

---

[34] Defendant's Exhibit 37.  The Payment Application seems at first blush to be a precise statement of the work completed by Domco.  On closer inspection, however, is it clear that the Payment Application is Domco's request for payment based upon its estimate of the progress toward completion of its work as of September 19, 2016.  In each instance, the percentage of completion stated in Column G is a round number for each line item.

[35] The payment terms of the contract were stated on the invoice signed by the parties, which provided for five installments.  Domco was due $30,000 "At Final Inspection" and the remaining and final "Balance due within 30 days of completion" was $22,905.  Plaintiffs' Exhibit 32.

[36] Prior to the second investment, the threshold for board membership was a 15% equity interest in BHB.

[37] Plaintiffs' Exhibit 3.  The check dated September 22, 2016 was drawn on the same joint checking account of the Crockers, was payable to "Bulkhead Brewing" in the amount of $16,000 and stated on the memo line that it was for "Bulkhead 4%."  The check was deposited in BHB's account at Capital One on September 22, 2016.  Defendant's Exhibit 39 (page 165).  Like the first investment, no purchase agreement was executed by the parties at the time of the second investment by the Crockers and the only documentary evidence of their investment is the memo line on the check.  Similarly, it appears that the BHB operating agreement was not amended to reflect their investment and seat on the board until much later.  If there was a version of the operating agreement executed at or about the time of the second investment, it was not introduced into evidence.

is there any evidence that Matthews diverted the second investment proceeds for his personal use.

### The Howard Bank Loan Guarantee: Oct. 2016-Jan. 2107

According to Crocker, Matthews had predicted that BHB's brewery would be open for business in October of 2016. That prediction, like many by Matthews, proved inaccurate. When Crocker followed up on October 21, 2016 (a month after his second investment), Matthews responded that progress was being made and that the Crockers were welcome to visit the brewery the following week. Nothing in their email correspondence suggests alarm on the part of Crocker or any effort by Matthews to misrepresent the state of progress towards opening the brewery.[38]

Around November 11, 2016,[39] Matthews told Crocker that BHB would not be able to open the brewery without a bank loan. Because he lacked the assets necessary to support a guarantee of the proposed loan, Matthews asked Crocker to act as a co-guarantor. According to Crocker, Matthews indicated at the time that the loan would be the last step and that the brewery would be open in two weeks once BHB received the loan proceeds. Crocker agreed because "in a way, it was protecting our investment."

In response to Crocker's request for a BHB balance sheet, Matthews provided him with a chart on November 12, 2016 that set forth (i) BHB's use of the $152,000 in capital raised from the Crockers, Bob and Helen Rhoades, and Dave Whitmore, and (ii) what was referred to as

---

[38] In his October 21, 2016 message, Crocker said: "Hey man just wanted to check in and see if things are progressing at all. Obviously we missed the goal of opening in October – do we have a new target date?" Matthews replied on October 23, 2016 as follows: "Yeah man things are still moving ahead. A bunch of cosmetic stuff is happening now. Such as the painting, countertop installations, bar install, table bases being attached, etc. It's fun stuff but the painting has taken longer than I thought.. so many walls! Would you and Leah have time to come in next week?" Defendant's Exhibit 12 (page 26).
[39] Defendant's Exhibits 14 and 15.

"Expenses Left."[40]   Among the remaining expenses identified by Matthews was $81,705 identified as "Total Buildout Remainder."

At this point, Crocker was on notice that whatever the prior confusion, the amount needed to pay for and complete the tenant improvement work by Domco was not and likely never had been $35,000.[41]   At the time, Crocker was a member of the board.  Crocker would have the court believe that he believed and relied upon the supposed past statements by Matthews that the amount BHB needed in order to pay Domco in full for all work performed or to be performed was substantially less than what he learned from the November 12, 2019 message.  If that were true, an investor and board member would be expected to express both shock and concern.  Crocker did not.  Incredibly, the record before the court reflects that Crocker simply went forward with his agreement to guarantee the BHB loan from Howard Bank as if Matthews had revealed nothing significant.

By November 20, 2016, Crocker had taken up negotiation with Matthews over the terms for his proposed agreement to guarantee the loan—namely, an increase in his equity position in BHB and other conditions.[42]   During these negotiations, Crocker made clear that he was seeking

---

[40]  Defendant's Exhibit 42.  Crocker testified that this exhibit was what was attached to the email message Matthews sent him on November 12, 2016 but was not admitted into evidence as part of Defendant's Exhibit 15.

[41]  The record shows that Matthews and Crocker understood a few weeks later that the amount needed to pay Domco in full for all work performed or to be performed was at least $91,611.25.  In his December 20, 2016 message, Matthews states he had adjusted the attached profit and loss projection to reflect payment to Domco of $80,000 from the loan proceeds and an additional $11,611.25 from revenues received during the first three months of BHB's operations.  Defendant's Exhibit 20 (pages 47 and 51).

[42]  In an email message to Matthews on November 28, 2016, Crocker said: "So I mentioned this to our financial advisor back when you and I first talked about it a few weeks ago.  The good news is that we are still willing to co-sign.  The bad news is that he recommended not taking on any additional risk without some additional equity."  Defendant's Exhibit 16 (page 33).  In another message to Matthew later that same day, Crocker indicated that his financial advisor was recommending that (i) no personal funds would be used to repay the loan, (ii) if personal funds were used, BHB would repay Crocker within 30 days or interest would accrue, and (iii) repayment of the loan would have priority over dividends to investors.  *Id.* (page 35).

a more active role in BHB by suggesting that he become BHB's treasurer.[43]  Matthews had

initially suggested a $71,000 loan, but later determined that $100,000 was needed and could be

obtained from Howard Bank.   After further negotiation, Matthews ultimately agreed on

January 3, 2017 that the Crockers would be treated as owners of a 25% equity interest in

exchange for a guaranty of a loan to BHB of $100,000 from Howard Bank, which guaranty

would be secured by an indemnity deed of trust on a townhouse rental property owned by

Crocker on Sycamore Ridge Road in Laurel, Maryland (the "Sycamore Ridge Property").

Matthews, Crocker, and the other members of BHB's board executed a resolution dated

January 6, 2017 that authorized BHB to borrow $100,000 from Howard Bank.[44]

     Matthews arranged the loan through Sean Hough ("Hough"), who was then an employee

at Howard Bank.   Crocker and Matthews met with Hough on January 12, 2017 for the loan

closing.   The closing took less than an hour to complete.   No evidence was presented with

respect to anything said at the closing.   Crocker testified that he did not read the loan documents

in advance and read the documents he signed (and only those he signed) for the first time at the

closing.   The loan was evidenced by a note,[45] security agreement,[46] and loan agreement,[47] each

executed on BHB's behalf by Matthews as its Chairman of the Board.   In addition, Matthews

---

[43]  In his December 2, 2106 email message to Matthews, Crocker said that "now that i have a little more time on my hands, i'm happy to work the financial side for you in sort of a treasurer/CFO role if that would help."  Defendant's Exhibit 18.

[44]  Plaintiffs' Exhibit 17 (pages HBANK/BULK HEAD 00134-136).  Apparently, the form of the resolution signed by the directors was drafted and/or suggested by counsel for Howard Bank.  Defendant's Exhibit 25 (page 75).

[45]  Promissory Note dated as of January 11, 2017.  Plaintiffs' Exhibit 12.  No representations were made by BHB in the note.

[46]  Commercial Security Agreement dated as of January 11, 2017, which granted Howard Bank a blanket security interest in virtually all of BHB's personal property assets.  Plaintiffs' Exhibit 13.  Although BHB made representations to Howard Bank in the security agreement, they were boilerplate representations related to the collateral pledged by BHB and none of them related to BHB's licensing as a brewery.  The security agreement did contain a standard provision regarding prompt compliance by BHB with "all laws, ordinances, rules and regulations of all governmental authorities."  *Id.* (page 2).  Based upon the evidence presented, BHB was in such compliance at the time Howard Bank made the loan.

[47]  Business Loan Agreement dated as of January 11, 2017.  Plaintiffs' Exhibit 14.

personally guaranteed the loan.  As agreed, Crocker also personally guaranteed the loan and granted a lien on the Sycamore Ridge Property to secure his guaranty obligation.[48]

The proceeds of the Howard Bank loan were deposited into a newly opened BHB checking account at the bank.[49]  Matthews immediately paid $75,000 to Domco from that account.[50]  Nothing in the record indicates that Matthews diverted any of the Howard Bank loan proceeds to his personal use.

Hough was not called to testify as a witness at trial.  No evidence was introduced with respect to any representation to Hough by BHB and/or Matthews prior to the loan closing on the subject of BHB's liquor licenses.  No loan application or other documentation was introduced into evidence.  Thus, Crocker's claim against Matthews related to his repayment of the Howard Bank loan rests solely on his contention that the representations made in the Business Loan Agreement were false because BHB did not then have a state or county liquor license.  By reason of his subsequent satisfaction of BHB's liability to the bank, Crocker asserts a right of subrogation to enforce the rights of Howard Bank against Matthews for the alleged misrepresentation.

Thomas E. Fongemie ("Fongemie"), a member of Howard Bank's special assets workout department, was called to testify at trial as the corporate representative of Howard Bank.  He was not employed by Howard Bank, however, at any time relevant to this dispute.  Fongemie testified

---

[48]  Commercial Guaranty dated as of January 11, 2017.  Plaintiffs' Exhibit 15.  The Individual Acknowledgement that accompanied the guaranty and signed by a notary indicates that Crocker actually executed the document on January 12, 2017.  *Id.* (page 4).  Although the Indemnity Deed of Trust executed by Crocker on the Sycamore Ridge Property was not introduced into evidence, its existence and recordation in the land records of Howard County, Maryland is confirmed by the Release of Indemnity Deed of Trust executed by Howard Bank on November 8, 2017.  Plaintiffs' Exhibit 21.

[49]  Defendant's Exhibit 38.

[50]  Totaro testified that Domco was paid $75,000 by BHB on January 17, 2017.  His testimony is confirmed by the fact that a check for that amount was honored and posted against BHB's account at Howard Bank on January 18, 2017.  Defendant's Exhibit 38.  For reasons unknown to the court, copies of none of the cancelled checks drawn on this account were introduced into evidence.

that (i) his department is entirely made up of former employees of First Mariner Bank as a result of its merger with Howard Bank in March of 2018, and (ii) most of Howard Bank's loan officers—including Hough—are now no longer employed by Howard Bank.  As Fongemie acknowledged, he has no personal knowledge about the origination of Howard Bank's loan to BHB or about any discussions or correspondence that preceded the loan.[51]

According to Fongemie, his review of the loan file did not reveal anything indicating that Howard Bank ever believed that Matthews had defrauded the bank or that the bank ever considered bringing a nondischargeability action against Matthews.  Nevertheless, Crocker asserted at trial that Matthews made false representations to Howard Bank at the time he executed the Business Loan Agreement on behalf of BHB.  Crocker interprets the Business Loan Agreement to contain a representation that at the time of execution of the agreement BHB had not only its TPP Brewer's Notice, but also its Maryland and Howard County liquor licenses. I disagree.  BHB simply did not make such representations in the Business Loan Agreement.

To be sure, that agreement contains boilerplate language that arguably represents that BHB has all licenses necessary to do business.[52]  For purposes of the present dispute, however, that language must be read as of the time the loan was made.  At that time, BHB was in financial

---

[51] Although Fongemie was a credible witness, his knowledge is limited to what he could glean from a cursory review of the file.  For example, he was not aware and learned for the first time on the witness stand that (i) the BHB brewery was not open for business at the time the loan closed, and (ii) the loan was originated in part so BHB could pay Domco for buildout costs.  As explained below, these circumstances were known to Howard Bank before it made the loan to BHB.

[52] Crocker relies upon the representation and warranties provisions of the Business Loan Agreement.  The "Organization" section of which states in pertinent part: "Borrower is a limited liability company which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Maryland.  Borrower is duly authorized to transact business in all other states in which Borrower is doing business, *having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business.  … Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage.*"  Plaintiffs' Exhibit 14 (page HBANK/BULK HEAD 00117) (emphasis added).  The court assumes (without deciding) for purposes of this memorandum opinion that the highlighted language extends beyond BHB's mere proper organization, continued existence, and general authority to conduct business as a microbrewery, and includes the specific state and local licenses needed from time to time in order for BHB to conduct business as a wholesale and retail microbrewery.

distress and it was only in the business of starting up its business, which depended upon completing the tenant improvements necessary to open the brewery.  Howard Bank knew about this state of affairs when the loan was made.  Matthews had previously disclosed to Hough that (i) BHB needed the loan to open for business, (ii) the loan proceeds would be used by BHB to fund completion of the tenant improvements, and (iii) BHB then had essentially no cash on hand.[53]  As further explained below, the additional state and county licenses in question were not needed on January 12, 2016, and they were dependent in any event on inspections that could only occur once the buildout was completed by Domco.

### Brewing Licenses and the End of BHB: 2017

In addition to the TTB Brewer's Notice it had in hand, BHB also needed both a state and a county license to operate as a wholesale and retail microbrewery in Howard County, Maryland. Although his efforts were perhaps naive, inadequate, and hapless, Matthews had been struggling to obtain these latter two licenses for some time before his first meeting with Crocker.  The evidence indicates that the state and county licenses were not discussed until after Howard Bank made its loan to BHB.[54]  Crocker testified that Matthews told him in February or March of 2017 that he had a state license that would allow BHB to be open on weekends for the first few

---

[53] For example, in an email message to Hough on December 15, 2106, Matthews indicated the need for and intended use of the loan: "Any update on the timeline?  My contractor is asking me about it and I would love to be able to give him some info if possible."  Defendant's Exhibit 21 (page 62-63).  A few days later in his message to Hough on December 19, 2016, Matthews told Hough that, "I am really excited thank you so darn much!  I can't wait to sign the [commitment] letter and finish up the brewery and get open!"  *Id.* (page 60).  Then on January 4, 2017, Matthews sent Hough an email message that said in part, "I am sitting on 0$ for the company right now which is why i am depending on this loan hah!"  Defendant's Exhibit 25 (page 79).  A copy of the January 4, 2017 message was sent to Crocker, who thus knew at that point about BHB's dire situation.  Indeed, BHB's balance in its account at Capital One was negative from December 5, 2016 through January 11, 2017.  Defendant's Exhibit 39 (pages 155-56).  Thus, Howard Bank knew BHB was not operating a business at the time the loan was made and any representation or warranty made upon signing the Business Loan Agreement was understood to be one made with respect to BHB's start up business as it then existed.

[54] I recognize that Crocker testified that the subject was discussed during his initial meeting with Matthews at the brewery on August 9, 2016.  For the reasons stated above, however, the court concludes that Crocker and Matthews in fact did not discuss the subject of licenses at that meeting.  Nothing in the evidence suggests the subject was discussed until (at the earliest) February of 2017.

months in operation while he finalized the county license that would allow BHB to be open seven days a week.  When investors became worried about the supposed opening dates continuing to pass without BHB opening, Bob Rhoades did a search online at the Maryland Comptroller's website after the Howard Bank loan closing and discovered there were no active licenses for BHB, which Crocker later confirmed by calling the state office.

At trial, Matthews confirmed that after many delays in the process he never finished obtaining the county license.  Matthews had previously filled the application out incorrectly numerous times; at one point including sales he had made to restaurants in Howard County, which led to an investigation because he was not properly licensed to do so.  He then enlisted the help of an attorney, Katherine Taylor, and completed the application prior to December of 2016. Ms. Taylor told him that a hearing had been scheduled in May of 2017, but by that time BHB had ceased operations.

As for the state license, Matthews testified that he applied right after getting the Lease and after two applications that he similarly did not fill out correctly he was told by Lou Berman, an official at the Comptroller's office, that the buildout had to be completed before the state would grant his full license because there were inspections the state needed to do of the completed space.  It is unclear if he ever applied for the state license again after his earlier attempts.

As it turned out, there was little reason after BHB obtained the loan from Howard Bank for Matthews to press on with his efforts to obtain the state and county liquor licenses.  Once Domco received the $75,000 payment, it undertook the work necessary to complete the tenant

improvements at the brewery, which were completed sometime in March of 2017.[55]  In the meantime, however, Crocker and the other investors began getting anxious about the opening delays and began questioning the feasibility of the business.  Investigations by Crocker and Bob Rhoades revealed that BHB did not have either a state or a county liquor license, that BHB was unable to pay the substantial amounts it then owed to the landlord and to utility companies and other creditors, and that BHB was not permitted to sell beer brewed before it obtained the necessary licenses.

These discoveries led to the rapid demise of BHB.  The investors met with Matthews at the brewery on March 25, 2017 after they learned the landlord was threatening to file an action to evict BHB due to the substantial rent arrearages.  At the meeting, the investors insisted and Matthews ultimately agreed to step down from his position as the manager of BHB.  Everyone at the meeting wanted Jonathan Staples to take over the business; but when he insisted that Matthews be indemnified by the investors if he did so, the investors rejected that request and Jonathan declined to step in to operate BHB.  Shortly thereafter, the investors decided that BHB could not be salvaged and shutdown the business.

By letter dated October 30, 2017, Howard Bank's counsel notified BHB and Crocker that the loan was in default and threatened enforcement action in the event the default was not cured by November 8, 2017.[56]  BHB did not cure the default, and Crocker determined that he should simply satisfy his guaranty obligation to Howard Bank.  By letter dated November 9, 2017, Howard Bank acknowledged receipt of $98,560.13 from Crocker in satisfaction of BHB's indebtedness and release of its security interest in BHB's assets and its lien on the Sycamore

---

[55] As Totaro testified, the buildout was completed in March, but did not pass final inspection because of a minor and easily remedied deficiency—the proper location of fire extinguishers.  According to Totaro, an occupancy permit would have been issued once BHB had corrected that deficiency.
[56]  Plaintiffs' Exhibit 19.

Ridge Property.[57]   That same day, the Crockers filed their complaint in this court against Matthews that commenced this adversary proceeding.

## CONCLUSIONS OF LAW

The exceptions to a Chapter 7 discharge are specified in § 523 of title 11 of the United States Code (the "Bankruptcy Code").  It is well-settled that those exceptions are to be narrowly construed in order to "protect the purpose of providing debtors a fresh start."  *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130  (4th Cir. 1999).   The Supreme Court has long cautioned against broad constructions of § 523 because they "would be incompatible with the well-known guide that exceptions to discharge should be confined to those plainly expressed." *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998).

Conversely, it is also well-settled that this court must be "equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code."  *Id.*  As the Supreme Court has indicated, while the Bankruptcy Code provides a debtor with a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt, the Bankruptcy Code also limits that opportunity to the "honest but unfortunate debtor."  *Brown v. Felsen*, 442 U.S. 127, 128 (1979) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

The burden of proof is on the creditor to establish by a preponderance of the evidence that a debt is not dischargeable.  *Kubota Tractor Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)); *Colombo Bank v. Sharp*, 477 B.R. 613, 619 (D. Md. 2008).  Although the allowance of a claim is generally governed by state law, "the issue of non-dischargeability is a matter of federal law governed by the Bankruptcy Code."  *Ortman v. Reinheimer*, 509 B.R. 12, 18 (Bankr. D. Md. 2014).

---

[57]  Plaintiffs' Exhibits 20 and 21.

Congress set forth the exception to discharge at issue here as follows:

> A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money … to the extent obtained by (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*; (B) use of a *statement in writing* (i) that is materially false; (ii) *respecting the debtor's or an insider's financial condition*; (iii) on which the creditor to whom the debtor is liable for such money … reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive; or (C) ….

11 U.S.C. § 523(a)(2) (emphasis added).

As the Fourth Circuit has explained, a creditor asserting a claim for nondischargeability under § 523(a)(2)(A) must prove five elements by a preponderance of the evidence—namely, "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages."  *Nunnery v. Rountree (In re Rountree)*, 478 F.3d 215, 218 (4th Cir. 2007).  As indicated by the Fourth Circuit in *Nunnery v. Rountree*, "Congress intended § 523(a)(2) to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means."  478 F.3d at 219-20.  Section 523(a)(2)(A) was written by Congress in the conjunctive.  Thus, a plaintiff must prove each element in order to prevail and failure to prove any one of them means a court must find that the debt in question is subject to discharge.

The dischargeability of claims based upon a debtor's statements regarding financial condition, however, are governed not by § 523(a)(2)(A), but by § 523(a)(2)(B) of the Bankruptcy Code.  As this court has previously explained,

> In order to sustain an action under Section 523(a)(2)(B) of the Bankruptcy Code, a plaintiff must show that: (1) the defendant made a written statement; (2) the written statement was about her financial condition; (3) the statement was materially false; (4) the defendant published the statement with the intent to deceive the

> plaintiff; and (5) the plaintiff reasonably relied on the false statement. The intent to deceive may be inferred by the totality of the circumstances, including a debtor's knowing or reckless disregard for the accuracy of financial statements. A written statement is materially false if it paints a substantially untruthful picture of the defendant's financial condition by misrepresenting information of the type that would normally affect a plaintiff's decision to grant credit. Mere inaccuracy is not sufficient, rather, material falsity requires a significant understatement of liabilities or exaggeration of assets.

*Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 372-73 (Bankr. D. Md. 2005) (citations omitted). Like § 523(a)(2)(A), § 523(a)(2)(B) is written in the conjunctive. Thus, a court must find that a debt is subject to discharge unless a plaintiff proves each element specified in § 523(a)(2)(B).

If a statement concerns the financial condition of the debtor or (as here) an insider of the debtor, the § 523(a)(2) exception applies only if the statement was made in a writing used by the debtor. The Fourth Circuit has long held that such a statement need not be a formal financial statement to fall within the scope of § 523(a)(2)(B). *Engler v. Van Steinberg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir. 1984). As this court has also previously pointed out, "with respect to the first element, the statement must have been either written by the debtor, signed by the debtor, or written by someone else and then adopted and used by the debtor." *Jones v. Owens (In re Owens)*, 549 B.R. 337, 349 (Bankr. D. Md. 2016). *See also, Hudson Valley Water Res. Inc. v. Boice (In re Boice)*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992) ("It is sufficient that Debtors either wrote, signed, or adopted such statement to find that documents were 'written' by them.").

The Fourth Circuit has also long held that for purposes of § 523(a)(2)(B) a statement "respecting" a debtor's financial condition is any statement that has bearing on the debtor's financial status, not just a statement regarding the debtor's overall financial status. *Engler*, 744

F.2d at 1062 ("A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. … Consequently, the statement must be in writing to bar the debtor's discharge.") (citing *Blackwell v. Dabney (In re Blackwell)*, 702 F.2d 490 (4th Cir. 1983)). In *Blackwell*, the Fourth Circuit held that oral representations made by an individual debtor about the financial condition of a corporation that was an insider were "outside the scope of 11 U.S.C. § 523(a)(2) and cannot be the basis for preventing discharge of the bankrupt." 702 F.2d at 492.

The Supreme Court's recent decision in *Lamar, Archer & Cofrin v. Appling*, 138 S.Ct. 1752 (2018), concerning the scope of § 523(a)(2)(B) is particularly significant here. In that case, the Court determined that the bankruptcy court should have dismissed a complaint under § 523(a)(2) for failure to state a claim because the alleged false statement was an oral one concerning a ***single asset*** of the debtor. The Court specifically rejected the interpretation that a statement "respecting" a debtor's financial condition only referred to statements encompassing the debtor's overall financial status. The statement must simply have "a *direct relation to or impact on the debtor's overall financial status*." *Id.* at 1761 (emphasis added). Given this, the Court found "[a] single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.* It follows from this reasoning that a statement about a single liability—namely, the amount owed by BHB to the landlord or Domco—is also a statement respecting financial condition that § 523(a)(2)(B) requires be made in writing for the exception to discharge to apply.

With these general principles in mind, the court turns to consideration of the merits of the claims made against Matthews. The plaintiffs assert two distinct claims for

nondischargeability—first, that the $52,000 lost on their two equity investments in BHB is not dischargeable under § 523(a)(2) of the Bankruptcy Code by reason of false statements by Matthews about (i) BHB's liabilities to its landlord and Domco, and (ii) BHB's licenses; and second, that the $98,560.13 paid by Crocker to Howard Bank is not dischargeable under § 523(a)(2) by reason of false representations made by Matthews to the bank in the loan documents, which Crocker asserts he is entitled to enforce by means of subrogation. As the court will explain in turn, none of these claims has merit.

### *The First Equity Investment*

Leah Crocker's claim with respect to the initial $36,000 equity investment in BHB must be denied because no evidence was presented with respect to the key element of a claim under § 523(a)(2)—namely, a representation made by Matthews on which she relied in fact. Her interaction with Matthews concerning both equity investments was limited to the meeting at the BHB business premises on August 10, 2016. Leah Crocker did not testify at trial. Her testimony would, of course, be the strongest evidence that Matthews made a representation on which she relied. While it might be possible to establish that fact through the testimony of other witnesses present at the meeting, the evidence presented here does not support such a conclusion.

Crocker's testimony about the August 10, 2016 meeting did not indicate anything about the substance of any statement made to Leah Crocker by Matthews during that meeting. In his testimony, Matthews described his meeting with Leah Crocker only in general terms. Nothing in the evidence presented indicates that Matthews and Leah ever discussed the subject of BHB's licenses or its liabilities to the landlord and Domco. That being the case, her claim for

nondischargeability with respect to the first equity investment is certainly not supported by a preponderance of the evidence and must be denied.[58]

Crocker's claim with respect to the first equity investment must also be denied.  The representations allegedly made by Matthews to Crocker were statements with respect to the financial condition of BHB, which was an "insider" of Matthews under the Bankruptcy Code.[59] Under § 523(a)(2), such a claim is nondischargeable only if it is based upon a written statement. As explained below, the evidence shows that only a few written statements were made by Matthews about BHB's financial condition, and the court concludes that any such written statements were either not materially false or not made with an intent to deceive (or both).

### Landlord Liabilities

Crocker and Matthews both testified at length about their discussions and statements supposedly made by Matthews about BHB's liabilities to its landlord and the extent to which the landlord was (or was not) deferring the payment of rent until BHB opened for business at the leased premises.  To the extent Matthews made any such statement prior to Crocker making the first equity investment in BHB, all such statements were oral, not written.  Any such oral statements concerned the extent of BHB's liability to the landlord and necessarily had a direct relation to or impact on the overall financial status and condition of BHB.  Thus, the Supreme Court's ruling in *Lamar, Archer & Cofrin v. Appling* and the prior decisions of the Fourth Circuit

---

[58] In addition, the court would be required to deny any claim asserted by Leah Crocker with respect to the first equity investment for the same reasons the court concludes Scott Crocker's claim must be denied.

[59] Matthews was the owner of more than a 20 percent equity interest in BHB and, in any event, was an officer and person in control of BHB. Accordingly, BHB is an insider of Matthews for purposes of § 523(a)(2). "The term 'insider' includes … affiliate …." 11 U.S.C. § 101(31)(E). "The term 'affiliate' means … corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor …." 11 U.S.C. § 101(2)(B).  The term insider also includes a "corporation of which the debtor is a director, officer, or person in control." 11 U.S.C. § 101(31)(A)(iv).  "The term 'corporation' … includes … unincorporated company or association." 11 U.S.C. § 101(9)(A)(iv).  A limited liability company is a corporation within the meaning of § 101(9). *In re Longview Aluminum, LLC.,* 657 F.3d 507, 509 fn.1 (7th Cir. 2011); see also Fed. R. Bankr. P. 7007.1 Advisory Committee Note (2003 Amendment) ("This includes listing membership interests in limited liability companies and similar entities that fall under the definition of a corporation in Bankruptcy Code § 101.").

require this court to find that any claim asserted by Crocker by reason of statements by Matthews about BHB's liabilities to its landlord prior to the first equity investment is not covered by the § 523(a)(2) exception to discharge because they were not made in writing.[60]

### Domco Liabilities

The extent of BHB's liability to Domco also necessarily had a direct relation to and impact on its overall financial status and condition. With one possible exception, all the statements made or allegedly made by Matthews about BHB's liability to Domco prior to Crocker's first equity investment were oral. As explained above, such oral statements are not a basis for a determination of nondischargeability under § 523(a)(2).

The possible exception is an August 3, 2016 response to Crocker's August 1, 2016 email message in which Matthews states: "Sadly we are still 35,000 short of opening."[61] Standing alone, this statement is at best a vague statement by Matthews that $35,000 was the amount he needed to get the brewery open for business. It makes no reference to the buildout. On the other hand, Matthews then believed that was the amount BHB needed to pay to get Domco to complete the buildout.

---

[60] Regardless of whether § 523(a)(2)(B) or § 523(a)(2)(A) applies, I conclude that any statements made by Matthews about liabilities to BHB's landlord were not made with intent to deceive. The discussions between Crocker and Matthews prior to the first equity investment spanned the 12-day period from August 1, to August 12, 2016. During this same time period, Matthews was involved in finalizing the amendment of the Lease which brought BHB's rent obligations current through July 31, 2016. BHB paid $21,000 to the landlord on August 11, 2016 (the day before the first equity investment was made by Crocker). The amendment was executed by the parties later that month. Although the additional $10,000 due the landlord on August 1, 2016 under the amendment was never paid, the parties expected that amount to be paid by means of a loan from Matthews' uncle that was never forthcoming. Matthews had no experience with commercial leases and was not clear on whether rent was due in advance or in arrears. At the time, Matthews was expecting BHB could open for business. Given that context, I simply do not believe that any oral statements about landlord liabilities attributed to Matthews by Crocker were (if made) made with intent to deceive.

[61] Plaintiffs' Exhibit 1. Crocker also seemingly understood this statement to refer to the amount needed to pay for the cost of completion of the buildout. As he said in his testimony (referring to the state of the buildout at the time of his visit on August 9, 2016), "Based on what I saw looking around, it looked like it could definitely be done for $35,000." Nothing about the statement made in the Matthews email message represents that $35,000 would pay Domco in full for all past and future work on the buildout.

At the time, Domco had apparently stopped work because BHB had not paid for its work completed as of that date. The Payment Application subsequently issued by Domco reflected $40,611.25 due for work completed and a balance of $51,093.75 that would be due under the contract for completion of the remaining work.[62]  As explained above, although Totaro testified that $40,611.25 was then due before the work was completed, he was mistaken. Under the terms of the contract, $52,905 of the $91,705 total was only due upon final inspection and completion of the project, meaning $38,800 was the amount that BHB was actually "short" at the time. I do not find the discrepancy of $3,800 to be material and, in any event, do not believe Matthews had any intent with his statement to deceive Crocker about the extent of BHB's liability to Domco. Thus, the § 523(a)(2) exception is not applicable with respect to any representations prior to the first investment with respect to BHB's liabilities to Domco.

## BHB Licenses

Turning now to the licenses, the court found as discussed above that as a matter of fact no representation was made to Crocker by Matthews concerning BHB's licenses. I am mindful that Crocker pointed at trial to the Kickstarter online crowdfunding campaign as evidence of a representation by Matthews that BHB had all necessary licenses. The Kickstarter campaign did indeed include the statement: "We have gotten licensed by the state and federal level which allows us to sell wholesale but because of our small, one barrel nano system we can only brew so much (31 gallons) at a time. We need this funding to move into a larger space and expand our equipment as well as brewing more beer and getting it out to the public." This statement was not made by Matthews with the intent to deceive Crocker—the campaign ended in March of 2015, well over a year before Crocker came across it. In addition, the statement clearly refers to BHB's license status as a nanobrewery, not as the prospective microbrewery Crocker visited in

---

[62]  Defendant's Exhibit 37. The Payment Application was for the period through September 19, 2016.

August of 2016.  More importantly, there is no evidence that Matthews directed Crocker to the Kickstarter website materials or stated that Crocker could rely on anything contained therein. Simply stated, Matthews did not "use" those materials to obtain any money from the Crockers.

The only other representation Crocker alleged regarding licenses prior to the first equity investment, was Crocker's testimony that he offhandedly asked Matthews on his first tour of the brewery on August 9, 2016 if Matthews had all the licenses he needed.  According to Crocker, Matthews supposedly said yes.  Matthews did not remember this question ever being asked. This is the discussion that the court found in fact never occurred.  In any event, it concerned the state of licensing for BHB's unopened microbrewery—an operation that then had all the licenses that it could obtain prior to obtaining an occupancy permit for its business premises.

I believe that a statement about the status of BHB's licenses is a statement with respect to its financial condition because the licenses are an asset essential to understanding its overall financial status.  Accordingly, § 523(a)(2) applies only if such statements were made in writing. No such statements were made or used by Matthews.  Regardless, no oral statements on the subject were made by Matthews prior to the first investment.  Thus, there is no grounds for Crocker's claim for nondischargeability based on such representations regardless of whether § 523(a)(2)(A) or § 523(a)(2)(B) applies.

### The Second Equity Investment

As with the first equity investment, no evidence was introduced of any representation made by Matthews to Leah Crocker during the period leading up to the second equity investment.  The entirety of the negotiation regarding the second equity investment was apparently conducted by means of email messages exchanged between Matthews and Crocker. There is no evidence that Leah Crocker was sent a copy of any of those messages.  Thus, her

claim for nondischargeability with respect to the second equity investment must also be denied because there is no evidence—let alone a preponderance of the evidence—to support a finding in her favor on any of the required elements for a claim under § 523(a)(2).[63]

At trial, Crocker did not establish that during the period leading up to the second equity investment Matthews made any representation regarding the status of BHB's licenses or the amount owed to its landlord. Instead, Crocker argues that Matthews again misrepresented the amount of BHB's liability to Domco. Such statements made by Matthews in his email messages could be a basis for a claim of nondischargeability if the evidence demonstrated each of the elements under § 523(a)(2)(B). It does not. As pointed out above, whatever Matthews may have said about BHB's liabilities to Domco, Crocker did not express surprise or concern when Matthews provided information two months later during the negotiations leading to the Howard Bank loan guaranty that indicated BHB's remaining liability to Domco was $81,705.[64] While Domco was mentioned in the exchange of email messages between Matthews and Crocker, the court found based upon the evidence that Crocker's focus was not on that subject, but on seizing the opportunity to increase his equity stake in BHB and thereby obtain a seat on BHB's board of directors—in other words, Crocker was not relying upon anything Matthews said about Domco at that point.

In any event, the court also found that any statements by Matthews about Domco prior to the second equity investment were made without any intent to deceive Crocker. Thus, the § 523(a)(2) exception is not applicable with respect to any such statements.

---

[63] In addition, the court would be required to deny any claim asserted by Leah Crocker with respect to the second equity investment for the same reasons the court concludes Scott Crocker's claim must be denied.

[64] A few weeks later, Matthews provided Crocker with information indicating that the remaining amount due Domco was at least $91,611.25 (an amount consistent with the Payment Application). Again, Crocker expressed no surprise or concern about the amount of BHB's liability to Domco.

### *The Howard Bank Loan Guarantee*

Crocker's claim against Matthews with respect to the Howard Bank loan is founded on his assertion of a right of subrogation to the rights of the bank against Matthews, including its right (if any) to assert that its claim against Matthews is nondischargeable under § 523(a)(2) of the Bankruptcy Code. In this regard, Crocker relies on § 509 of the Bankruptcy Code as well as published opinions in *In re Morrison*, 555 B.R. 92 (Bankr. D. Mass. 2016), *Anderson v. SunTrust Mortgage, Inc. (In re Judd)*, 471 B.R. 830 (D.S.C. 2012), and *Cornmesser v. Swope (In re Cornmesser's, Inc.)*, 264 B.R. 159 (Bankr. W.D. Pa. 2001). None of these authorities, however, directly address the question presented here—namely whether a guarantor is subrogated to a creditor's right to assert issues of nondischargeability against not just the primary obligor, but also against a co-guarantor. For purposes of this memorandum opinion, the court assumes without deciding that Crocker is entitled by right of subrogation to assert any claim Howard Bank might have had for nondischargeability of its debt against Matthews, at least (as discussed in *Morrison*) to the extent of the amount of the claim Crocker holds against him under the principles of contribution.

However, even if Crocker is entitled to the right of subrogation with respect to any claim of nondischargeability against Matthews with respect to the Howard Bank loan, there was simply no misrepresentation by Matthews that warrants holding that Howard Bank's claim is nondischargeable. Crocker's sole argument was that boilerplate language in the Business Loan Agreement that BHB had all necessary licenses to do business was a misrepresentation because BHB did not have a state or county liquor license. At the time of the loan, however, BHB's business was not as an operating microbrewery; its business was to complete the buildouts necessary to open (and thus get the licenses that required a final inspection of the completed

premises).  No evidence was introduced at trial of any actual reliance by Howard Bank on this boilerplate language.  In any event, Howard Bank was fully aware at the time the loan was made that BHB was not yet an operating business.  Accordingly, the court concludes that no misrepresentation was made to Howard Bank in the Business Loan Agreement.  Because the court finds that Howard Bank has no claim for nondischargeability on the grounds of misrepresentation, Crocker's assertion of this right by subrogation must be denied as well.

## CONCLUSION

In sum, the court finds the claims of the Crockers simply to be the result of a bad investment.  It is understandable that they are unhappy that their investment did not turn out the way they hoped.  Their disappointment, however, does not equate to fraud on the part of Matthews.  Bankruptcy is meant to protect debtors like Matthews from a life of financial ruin due to bad business judgment.  For the reasons stated above, the court will enter a separate order consistent with this memorandum opinion that denies the Crockers' request that their claims be held to be nondischargeable.

cc:    Brian T. Gallagher, Esq.
       Council, Baradel, Kosmerl & Nolan, PA
       125 West Street, 4th Floor
       Annapolis, Maryland 21404
       *Attorney for Plaintiffs*

       Alan J. Belsky, Esq.
       Belsky, Weinberg & Horowitz, LLC
       220 N. Liberty Street
       Baltimore, Maryland 21201
       *Attorney for Defendant*

**-- END OF MEMORANDUM OPINION --**